IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL ACTION No.: 5:11CV51-RLV

| | |
|---|---|
| INTERSTATE EQUIPMENT COMPANY,<br>          Plaintiff,<br><br>    vs.<br><br>ESCO CORPORATION,<br>          Defendant. | **Memorandum and Order** |

**THIS MATTER** is before the Court upon Defendant ESCO Corporation's Motion for Summary Judgment and all related memoranda and exhibits. (Doc. 32)

The case is scheduled for bench trial during the November 2012 Term in the Statesville Division.

### I. Background & Procedural History

This civil action arises out of the dissolution of a dealer - supplier relationship between Plaintiff Interstate Equipment Company ("IEC") and Defendant ESCO Corporation ("ESCO") and governed in part by the North Carolina Farm Machinery Franchise Act (the " Act"), N.C. GEN. STAT. § 66-183, *et seq.*[1]

IEC is a North Carolina corporation with its principal place of business in Statesville, North Carolina. (Compl. ¶ 1). During the relevant time period, IEC operated as a retailer for

---

[1] Under the North Carolina statute, IEC is a "Dealer," which "means a person engaged in the business of selling at retail farm, construction, utility or industrial, equipment, implements, machinery, attachments, outdoor power equipment, or repair parts." N.C. GEN. STAT. § 66-180 (4). Likewise, ESCO is a "Supplier," which "means a wholesaler, manufacturer, distributor, or any purchaser of assets or stock of any surviving corporation resulting from a merger or liquidation, any receiver or assignee, or any trustee of the original manufacturer, wholesaler, or distributor who enters into an agreement with a dealer." N.C. GEN. STAT. § 66-180 (9).

multiple suppliers of equipment (used primarily in construction). (Compl. ¶ 1). ESCO, an Oregon corporation with its principal place of business in Portland, Oregon, "manufactures and sells ground engaging tools as products used in construction, mining and other applications." (Compl., ¶ 2 / Counterclaim, ¶ 1 / Agreement at 1). Prior to this dispute, IEC and ESCO had been in business together for decades. (Def.'s Mem. In Supp., at 2.)

On or around October 16, 2000, IEC and ESCO entered into a "Dealer Sales and Service Agreement" (hereinafter "Agreement"), in which IEC was appointed "an authorized ESCO dealer" for the sale and service of certain products offered for sale by ESCO. (Compl. ¶ 4 / Agreement at 10.) IEC dealt in "[a]ll Earthmoving and Crushing products sold through ESCO Mining and Construction dealers," including wear parts ("Products").[2] (Compl. ¶ 4 / Agreement at 10, Supplement "A") The Agreement appointed IEC an ESCO dealer in North and South Carolina ("Territory"). Under the Agreement, IEC was tasked with product sales, product and customer service, warranty service, and customer support. (Agreement, at 1-2.) The Agreement provided for termination by either party with notice to the other party, or for cause.[3] (Agreement, ¶¶ 12, 13).

Between 2005 and 2008, IEC began to experience significant financial distress.[4] (Def.'s

---

[2] In terms of the product line, IEC was not authorized to deal in "crusher wear parts to the Vulcan Materials properties in South Carolina." (Compl. ¶ 4)

[3] Section 12.1 reads: "The term of this Agreement shall begin on the date appearing on page 1 and, unless terminated for cause, shall continue until terminated by either party upon notice to the other. The effective date of termination specified in such notice shall not be earlier than ninety (90) days after receipt of such notice." (Agreement, ¶ 12.1)

[4] Frank Eller ("Eller"), President and then sole shareholder of IEC, attributes much of IEC's financial condition at the time on the national economy and overall decline of the construction industry – external factors Eller contends were out of IEC's control. According to ESCO, however, in addition to any external stressors, IEC was mismanaged for a number of years, which led to the departure of critical management personnel for various reasons and the loss of accounts with other suppliers. The reasons for

Mem. In Supp., at 3-8 / Exh. 10) According to ESCO, IEC routinely asked to "roll" accounts receivable with ESCO in order to postpone payment for ESCO parts. (Def.'s Mem. In Supp., at 4.) By 2009, some of IEC's accounts receivables with ESCO had been extended to a term of over three hundred days. (Def.'s Mem. In Supp., at 4 / Dillard Dep. 41:8-15).

Pursuant to the terms of the Agreement, ESCO requested that IEC produce audited financials for 2009. (Def.'s Mem. In Supp., at 6 / Agreement, ¶ 2.6). IEC's financial reports for 2009 weren't received by ESCO until mid-June 2010, several months later than expected. (Def.'s Mem. In Supp., at 4.) Upon receipt of IEC's 2009 financial reports, ESCO learned that IEC's sales were essentially half what they had been in 2008 – a decrease from $22.3 million to less than $10 million – and that IEC sustained a net loss of more than $1 million dollars – $1.1 million, which was five times greater than its 2008 loss. (Def.'s Mem. In Supp., at 4, 6.) IEC's financial health was described by IEC Chief Financial Officer, Mark Dillard, as being in "dire straits."[5] (Def.'s Mem. In Supp., at 4 / Dillard Dep. 65:13-15).

On June 22, 2010, ESCO personnel including Dave Poer, General Sales Manager, and Jim Richards, Credit Manager, met with Eller to discuss these concerns and the future of the business relationship. Given IEC's current level of business and recent financial statements, ESCO decided to reduce IEC's credit line to $100,000. (Def.'s Mem. In Supp. / Exh. 17)

On August 18, 2010, ESCO notified IEC in writing that it was terminating the Agreement, effective December 1, 2010, "with respect to IEC's North Carolina operations

---

IEC's financial situation, while probative of the termination for good cause issue initially raised by IEC, are not relevant to the repurchase question remaining before the Court but are noted for purposes of general background information.

[5] On September 8, 2010, counsel for IEC wrote Eller to address IEC's serious financial situation and to suggest options for IEC's future viability. (Def.'s Exh. 9)

only."[6] (Exh. B) (hereinafter "Notice"). ESCO asserted that its decision to terminate the Agreement, although a "difficult" one, was supported by "good cause." (Notice, at 1.) ESCO explained, "we do not have confidence that IEC can any longer represent ESCO and discharge the duties and responsibilities of a dealer representative of our Company." *Id*. More specifically, ESCO summarized the bases for its decision to terminate IEC's North Carolina representation as follows: (i) "the departure and loss of critical managers at IEC," (ii) its own doubt, as well as doubt expressed by Eller, "as to IEC's ability to continue in business and to meet its financial obligations," and (iii) the "impending closeout of IEC's relationships with major suppliers." *Id*.

ESCO explained that ESCO would honor all of IEC's outstanding orders, subject to COD payment by IEC. (Notice, at 1.) ESCO referred IEC to Section 12.2 of the Agreement for more detailed terms for orders and payment in the interim period. *Id*. ESCO also reiterated that in the event ESCO sold directly to customers within IEC's North Carolina Territory prior to December 1, 2010, that IEC would be paid a commission consistent with Section 4 of the Agreement. *Id*. ESCO's Notice provided IEC "ninety days to wind up its ESCO product business in North Carolina." *Id*.

With reference to ESCO product in IEC's possession, the Notice stated:

> In the event that any ESCO machinery, industrial equipment, outdoor power equipment, attachments or spare parts (collectively referred to as "Inventory"), or specialized repair tools, remain unsold as of December 1, 2010, ESCO will repurchase those items from IEC, subject to the following limitations: ESCO will pay 100% of the current net price for all new, unused, unsold, undamaged and

---

[6] Although IEC's territory was to be decreased, IEC was still able to act as an ESCO dealer within South Carolina. Other than the mention that the North Carolina market has always been important to ESCO, the record does not make clear ESCO's reasons for terminating IEC's ability to deal in ESCO products within North Carolina while allowing IEC to remain an authorized dealer in South Carolina.

complete machinery, equipment and attachments; 75% of the current net price of all new, unused, and undamaged repair and superseded parts; 75% of the net cost of all specialized repair tools purchased by IEC within the last three years; and 50% of the net cost of all specialized repair tools purchased by IEC within the previous four through six years. The specialized tools for which IEC seeks re purchase must be unique to the ESCO line and must be in complete and resalable condition. In addition, for any item of equipment or machinery that was used primarily for lease or demonstration, repurchase shall be at a depreciated value, but shall be repurchased only if such equipment or machinery is in new condition and has not been damaged.

This offer to repurchase does not extend to:

(1) A repair part with a limited storage life or otherwise subject to deterioration; or
(2) A single repair part that is priced as a set of two or more; or
(3) A repair part that, because of its condition, is not resalable as a new part without repackaging or reconditioning; or
(4) Any repair part that is not in new, unused and undamaged condition; or
(5) Any item of Inventory for which IEC does not hold title free of all claims, liehns and encumbrances (except for any security interest ESCO may hold); or
(6) Any Inventory, repair parts or specialized tools that IEC orders after this notice of termination; or
(7) Any Inventory purchased more than 36 months prior to this notice of termination; or
(8) Any Inventory or specialized tools that IEC purchased from a source other than ESCO.

As an alternate to repurchase by ESCO, IEC may retain any such Inventory and specialized tools as it desires. Since this termination affects IEC's North Carolina dealership only, IEC may wish to keep the Inventory and specialized tools. IEC's request to repurchase Inventory or specialized tools should be made in writing, and should include a list of equipment for which repurchase is requested. An ESCO representative will inspect the Inventory and specialized tools prior to acceptance for repurchase within sixty (60) days after receipt of IEC's request for repurchase.

(Notice, at 1-2.) Therefore, according to the Notice, ESCO contemplated satisfaction of certain

conditions precedent to its repurchase obligation. *Id*. For example ESCO expected that IEC

would identify the items IEC wanted ESCO to repurchase and formally request repurchase of

those items in writing. *Id*. ESCO similarly stated that it must have an opportunity to inspect any items so designated for repurchase by IEC within sixty days of the request. *Id*. Consistent with the Notice, repurchase of parts in particular was to be accomplished within the ninety day termination period or, in any event, before December 1, 2010. *Id*. IEC apparently never submitted a written request to ESCO concerning repurchase within the ninety day termination period.

IEC commenced the instant lawsuit against ESCO on March 28, 2011, in the North Carolina General Court of Justice, Catawba County Superior Court, alleging that ESCO wrongfully terminated the parties' Agreement. (Doc. 1 / Exh. B)

On April 19, 2011, ESCO timely removed the case to federal court. (Doc. 1) On April 29, 2011, ESCO filed an Answer and Counterclaim asserting numerous defenses and seeking declaratory relief with regard to ESCO's rights under the Agreement, namely, compliance with the Agreement and the Act. (Doc. 3) ESCO's Counterclaim specifically alleged 1) that ESCO's termination of the Agreement fully complied with the Act; 2) that ESCO issued a credit to IEC in the amount of $35, 374.18, and issued a Return Material Authorization ("RMA") to IEC (which pertains to repurchase); and 3) that "IEC has not taken any action on the RMA and that repurchase remains open pending receipt of materials from IEC." (Counterclaim, ¶ 12)

On May 18, 2011, IEC filed its Answer to the ESCO Counterclaim. (Doc. 10)

On June 15, 2012, IEC voluntarily dismissed its First Cause of Action (*i.e.*, the wrongful termination or termination in absence of good cause) *with prejudice*, pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure. (Doc. 38) IEC explained its intention to dismiss its wrongful termination claim in favor of its new or Second Cause of Action based upon ESCO's failure to receive and reimburse IEC for parts. *Id*. In its Amended Complaint,

IEC seeks relief pursuant to Sections 66-183, 184, and 185 which address the Supplier's [ESCO's] duty to repurchase inventory[7] held by the Dealer [IEC]. (Am. Compl.)

On June 1, 2012, ESCO moved for summary judgment as to all causes of action, including IEC's original wrongful termination claim. (Doc. 32)

On June 5, 2012, ESCO filed an Amended Answer & Counterclaim. (Doc. 33) In its Counterclaim, as amended, ESCO averred:

> "Plaintiff's [IEC's] inventory is subject to a lien in favor of Piedmont Bank, recorded on the public record in North Carolina. In addition, ESCO is informed and believes that such inventory is subject to a second, unrecorded lien in favor of Frank Eller."

(Am. Counterclaim, ¶ 13) In essence, ESCO contended in its Counterclaim that because IEC could not transfer clear title to its inventory of ESCO parts, ESCO is relieved of any obligation to repurchase by virtue of Section 66-185(4). *Id.*

On September 19, 2012, IEC filed an untimely Motion for Summary Judgment and simultaneously sought an extension of time. (Docs. 48-53) However, IEC's motion for an extension of time was denied by the magistrate judge without prejudice because IEC did not consult with opposing counsel in violation of the local rules. (Doc. 55) The following day, IEC made a second request for an extension of time (*i.e.*, to prosecute its Motion for Summary Judgment). (Doc. 56) ESCO contemporaneously filed a Motion to Strike IEC's untimely Motion for Summary Judgment. (Doc. 57) The magistrate judge likewise denied IEC's second motion for additional time, which precluded IEC's dispositive motion and rendered ESCO's

---

[7] "Inventory" means farm implements and machinery, construction, utility and industrial equipment, consumer products, outdoor power equipment, attachments, or repair parts. N.C. GEN. STAT. § 66-180(7). For convenience, unless otherwise specified herein, the term "inventory" refers to all of the ESCO product including repair parts.

Motion to Strike moot. (Doc. 61) As a result, the memoranda and exhibits filed in support of the IEC motion are not properly before the Court.[8]

Thus, the only issue that remains for decision by the Court is whether summary judgment is appropriate on IEC's "Seller's Duty to Repurchase" claim.

## II. Standard of Review

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." F̲ED. R. C̲IV. P. 56(c); *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). A genuine issue exists only if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In conducting its analysis, the Court views the evidence in the light most favorable to the non-moving party. *Celotex Corp.*, 477 U.S. at 325.

## III. Discussion

The relationship between IEC and ESCO is governed by the North Carolina Farm Machinery Franchise Act, N.C. G̲EN. S̲TAT. § 66-183, *et seq.*, as well as the parties' Agreement.[9] The Agreement, which is largely consistent with the Act, appears to supplement the parties' respective statutory obligations.

---

[8] IEC did not file a memorandum of law in response or in opposition to ESCO's motion.

[9] The Agreement states that it is to "be construed in accordance with the laws of the State of Oregon." (Agreement, ¶ 16.5). The parties will want to explain their respective positions (to the extent they may have differing views) to the Court regarding the interplay between construing the Agreement consistent with Oregon law, and applying the Agreement and the North Carolina statute to the facts to be decided.

The Agreement required IEC to "maintain adequate replacement parts inventories and service capabilities" in order to provide the designated services. (Agreement, ¶ 2.2, 4). This contractual provision triggers ESCO's statutory duty to repurchase inventory as set forth within Section 66-183. IEC seeks relief pursuant to Section 66-183, which addresses the Supplier's [ESCO's] duty to repurchase inventory held by the Dealer [IEC]:

> (a) Whenever a dealer enters into an agreement evidenced by a written or oral contract in which the dealer agrees to maintain an inventory, and the agreement is terminated by either party, the supplier shall repurchase the dealer's inventory as provided in this Article unless the dealer chooses to keep the inventory. If the dealer has any outstanding debts to the supplier, then the repurchase amount may be set off or credited to the retailer's account.

N.C. GEN. STAT. § 66-183. By its own terms, Section 66-183 permits the dealer to keep the inventory. *Id.* Section 66-183 also addresses how to adjust a dealer's [IEC] account with the supplier [ESCO] in the event that the dealer [IEC] has an outstanding balance with the supplier [ESCO].[10]

IEC now seeks to enforce the repurchase provisions within the Agreement. IEC alleges that at the time ESCO notified IEC of its intention to terminate the dealer relationship effective December 1, 2010, that IEC had in its inventory "ESCO parts with a current net price of approximately $363,130." (Am. Compl., ¶ 4) ESCO objects on multiple grounds and claims that summary judgment in its favor is appropriate given that IEC's inventory of ESCO product was (and is) subject to a security interest. Accordingly, the Court considers whether any genuine issue of material facts exists with respect to the enforcement of the relevant portions of the Agreement and application of the statutory provisions concerning ESCO's duty to repurchase

---

[10] As noted, *infra*, IEC had an outstanding balance with ESCO. IEC's alleged inability to satisfy its debt was cited by ESCO as one of the reasons for its decision to terminate the Agreement.

Inventory (and /or parts) from IEC.

Summary judgment disposition is not appropriate in that the Court does not have the necessary materials to rule as a matter of law.[11] The outstanding factual matters include proper characterization of the Inventory (*i.e.*, new, unused, undamaged, complete) as well applicability of exceptions to repurchase.

**1. Inventory Not Subject To Repurchase** (ESCO's Sixth Defense)

ESCO points out that the repurchase is only required for 1) "new, unused, unsold, undamaged and complete" equipment; and 2) "new, unused and undamaged" repair parts. (Def.'s Mem. In Supp., 14-15). Section 66-184, which provides in pertinent part:

> (b) The supplier shall pay the dealer:
>
>> (2) Ninety percent (90%) of the current net price of all new, unused, and undamaged repair and superseded parts.
>
> (d) The supplier shall pay the cost of shipping the inventory from the dealer's location and shall pay the dealer ten percent (10%) of the current net price of all new, unused, undamaged repair parts returned, to cover the cost of handling, packing, and loading. The supplier may perform the handling, packing, and loading instead of paying the ten percent (10%) for the services. The dealer and the supplier may each furnish a representative to inspect all parts and certify their acceptability when packed for shipment.

N.C. Gen. Stat. §§ 66-184(b)(2) and (d) (2012).

The characterization of the various items of Inventory appears to present genuine issues of material fact precluding summary judgment disposition.

---

[11] One of the arguments made by IEC in response to ESCO's Motion to Strike was that IEC's filings spoke to the repurchase obligation at issue. If the parties had not already agreed to proceed with a bench trial, apparently conceding genuine issues of material fact, IEC's untimely Motion for Summary Judgment (and supporting documentation) could be construed as a response in opposition to ESCO's Motion for Summary Judgment rather than a cross-motion.

### 2. Statutory Exceptions

The Act also contains exceptions to the Supplier's duty to repurchase.

#### a. Dealer's Election To Keep Inventory

The Act does not require the Seller to repurchase "[a]ny inventory that the dealer chooses to keep." N.C. Gen. Stat. § 66-185(5). Thus, another issue of fact is whether IEC indicated to ESCO an intention to keep the Inventory. As noted by ESCO in the Notice, it would be feasible for IEC to decide to keep the Inventory, particularly repair parts, because IEC was able to continue to act as an authorized ESCO dealer in South Carolina.

#### b. Encumbered Inventory (ESCO's Fourth Defense)

ESCO contends that it attempted to comply with its statutory and contractual repurchase obligation, but was excused from repurchasing any of IEC's Inventory under the exception for encumbered inventory. *See* N.C. Gen. Stat. § 66-185(4). Under Section 66-185(4), North Carolina does not require repurchase from a dealer of:

> (4) An item of inventory for which the dealer does not have title free of all claims, liens, and encumbrances other than those of the supplier.

N.C. Gen. Stat. § 66-185(4). ESCO provides the Court with a copy of Piedmont Bank's security interest in all of IEC's assets, including Inventory. (UCC Financing Statement / Def.'s Exh. 20).

IEC does not dispute that the exception for Inventory subject to an encumbrance applies. However, IEC represents that IEC is in a position to eliminate any encumbrance on the inventory "prior to or simultaneously with the repurchase." (Am. Compl., ¶ 7)

#### c. Expiration Of Duty To Repurchase Parts (ESCO's Fifth Defense)

ESCO next contends that IEC's *parts repurchase opportunity* has expired. (Def.'s Mem. In Supp., 14-15). The Agreement contemplates that the repurchase of parts (as opposed to all

Inventory) is to occur during the 90 day termination period subject to ESCO's Parts Return Policy. (Agreement, ¶ 12.4) In connection with the Seller's [ESCO's] Duty to Repurchase, the parties' Agreement adds to the statutory requirements as follows:

> If such notice of termination is given by either party, any Product returns thereafter may be made only in accordance with ESCO's Parts Return Policy. During the 90 day termination period, Dealer must furnish ESCO with a list of parts which Dealer desires to return. ESCO will then advise Dealer which of those parts may be returned. Returnable parts shall be limited to parts then currently stocked by ESCO. All returned parts must be received by ESCO prior to the effective termination date. All refurbishing costs will be for Dealer's account and final account adjustment shall not be made until such costs are known.

(Agreement, ¶ 12.4).

### d. Inventory Purchased More Than 36 Months Prior To Termination Or After Notice of Termination

Finally, ESCO also contends that it is likely that certain IEC Inventory is not subject to repurchase because of its age or date of purchase. (Def.'s Mem. In Supp., at 14.) However, the Court does not have the information necessary to consider this exception.

## IV. Order

For all of these reasons, ESCO's Motion for Summary Judgment is hereby **DENIED**. Accordingly, this matter shall proceed to **Bench Trial**, the undersigned presiding, on **Monday, November 19, 2012, at 9:30 a.m., Statesville Division.**

Signed: October 18, 2012

Richard L. Voorhees
United States District Judge