**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL ACTION No.: 5:11CV51-RLV**


| | | |
|---|---|---|
| INTERSTATE EQUIPMENT COMPANY, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Findings of Fact** |
| | ) | **& Conclusions of Law** |
| ESCO CORPORATION, | ) | |
| Defendant. | ) | |
| _____ | ) | |


**THIS MATTER** is before the Court to render factual findings and legal conclusions

following a bench trial held in November 2012 to resolve a dispute concerning the dissolution of

a dealer - supplier relationship between Plaintiff Interstate Equipment Company ("IEC") and

Defendant ESCO Corporation ("ESCO") and governed in part by the North Carolina Farm

Machinery Franchise Act (the "Act"), N.C. GEN. STAT. § 66-180, *et seq.*[1]

## I.      Factual Findings

1.      Plaintiff Interstate Equipment Company ("IEC") is a North Carolina Corporation

with a principal place of business in Statesville, N.C.

2.      Defendant ESCO Corporation ("ESCO") is an Oregon corporation with its

principal place of business in Portland Oregon.

3.      ESCO is an independent developer and manufacturer of highly engineered wear

and replacement products and services for mining, construction, wood processing, rock crushing,

dredging and other industrial industries. ESCO manufactures ground engaging tools, buckets,

blades, dredge cutterheads, truck bodies, wear solutions and other consumable products. ESCO

---

[1] The Court also incorporates by reference its October 18, 2012 Memorandum and Opinion on
summary judgment. (Doc. 65).

also develops high-performance products for industrial applications such as conveying and scrap recycling. Products include hammer and impact crusher wear parts, conveying chains and wire rope fittings.

4.      Well prior to 2000, ESCO and IEC entered into a distribution relationship, whereby ESCO sold its products to IEC, and IEC sold those products to customers in some of the industries listed above. During the term of IEC's relationship with ESCO, IEC maintained an operating location in Columbia, South Carolina, as well as two operating locations in North Carolina.

5.      On or about October 16, 2000, ESCO and IEC signed a "Dealer Sales and Service Agreement" ("Agreement") memorializing the distribution relationship between ESCO and IEC for North Carolina and South Carolina. (Agreement). IEC was authorized to deal in ESCO wear parts across North and South Carolina with one exception; IEC was not authorized to sell crusher wear parts to Vulcan Materials properties in South Carolina. (Agreement, Suppl. A).

6.      Under the Agreement, IEC was required to "Maintain adequate replacement parts inventories and service capabilities as required to provide such services." (Tr. 17; Agreement, § 2.2, ¶ 4). Supplement "A" to the Agreement further explained:

> "Dealer agrees that it will maintain a sufficient inventory to service the market and which will be adequate to support the agreed upon sales volume objective. The inventory level shall be established in conjunction with the annual ESCO / Dealer Marketing Plan. The inventory level will be reviewed annually by ESCO and may be adjusted at that time, by mutual agreement, in response to changes in the sales volume objective."

(Agreement, Suppl. A). Supplement A provided that the "Dealer and ESCO will mutually establish, on an annual basis, a forecasted sales volume objective within the Territory" and that the "sales volume objective shall be established with the annual ESCO / Dealer Marketing Plan"

and likewise subject to adjustment by mutual agreement "in response to changes in the market conditions within the Territory." *Id*. There was no established minimum or maximum inventory level.

7.    Mr. Edward E. (or "Gene") Barkley ("Barkley") testified on behalf of IEC. Mr. Barkley was the IEC Parts Manager for approximately twenty years. (Tr. 10, 74). In his last five years with IEC, Barkley served the dual role of General Parts and Service Manager for IEC. (Tr. 74). Prior to assuming the Parts Manager role, Barkley worked in the service department performing repairs / maintenance on equipment within the Carolinas, and occasionally in Virginia, Georgia, and Tennessee. (Tr. 74).

8.    Mr. Dave Poer ("Poer") testified on behalf of ESCO. Poer currently serves as General Sales Manager for Eastern North America at ESCO and is responsible for oversight of sales to customers within that region, including IEC prior to termination of the Agreement.[2] (Tr. 188–89).

9.    The rationale behind Dealers like IEC maintaining an inventory of replacement parts was for the convenience of the customer, namely, to enable IEC to be in a position to provide replacement parts to its customers in a timely manner, thereby maximizing sales.[3] (Tr. 62–63, 80).

---

[2] The top-to-bottom heirarchy of management at ESCO starting with Dave Poer is: Jim Ewing, Regional Sales Manager; then Roger Long, District Manager. (Tr. 189). Roger Long replaced Dave Nightlinger as District Manager in 2009. (Tr. 190, 160–61).

[3] According to Barkley, maintaining ample inventory of repair parts at the IEC facilities was prudent in that each size of loader could require two to four different sized buckets and each bucket could require a different cutting edge. (Tr. 105).

10.     ESCO offered programs to its dealers to assist in the management of inventory levels and to promote the fiscal responsibility of its dealers, including an Annual Return Policy and a Swap or Conversion Exchange Policy.

11.     IEC had the ability to request, subject to ESCO's permission, the return of ESCO products not previously used or sold in accordance with ESCO's Parts Return Policy. (Agreement, § 14).  ESCO's Annual Return Policy provided dealers the opportunity at year's end to return four percent of their "qualified purchases" made within the previous two years (or twenty-four months) to ESCO.

12.     Under the Annual Return Policy, "qualified parts" did not include parts that were made to order or made per a manufacturer's specifications.   (Tr. 223).  According to ESCO, crusher manganese parts are made to order and, therefore, are not qualified parts.  Another example of a part that does not fall into the "qualified parts" category is: dragline bucket.  (Tr. 223).  Obsolete parts are not "qualified parts" for purposes of the ESCO Annual Return Policy.

13.     IEC did not regularly take advantage of the ESCO Annual Return Policy but had, in fact, successfully returned parts in physical condition similar to the parts shown in Plaintiff's Exhibits 18A through X to ESCO in the past.[4]  (Tr. 222–23, 36–37).  According to Defendant, IEC returned no parts in 2007; but returned up to $16,000 worth of parts to ESCO in 2009.

14.     ESCO also offered its dealers a Swap or Conversion Exchange Program ("Swap Program") during the introduction period of new products.  The Swap Program permitted the dealer to benefit from a one-to-one swap of an older part for a newer model / version of the same

_____

[4] IEC's counsel's questioning of Mr. Poer on cross-examination elicited answers which implied that in the past, ESCO would repurchase parts at some discounted rate if the condition or appearance of the part warranted a discount.  (Tr. 237).

replacement / repair part. (Tr. 224). ESCO would allow the dealer to send back the old part in exchange for purchasing the newer part.

15. IEC did not always take advantage of the Swap Program and explained that if its customer had equipment that required the older model part, IEC needed to have the older replacement part on hand.

16. According to ESCO, IEC routinely asked to "roll" accounts receivable with ESCO in order to postpone payment for ESCO parts.[5]

17. During the relevant time period, IEC's President and sole shareholder was Frank Eller.

18. On or about June 7, 1994, Mr. Eller executed a document entitled Durable Power of Attorney ("POA") in favor of Attorney Douglas G. Eisele.[6] (Pl.'s Exh.12). The document was filed on the public record in Iredell County on July 17, 2012. Since the bench trial, the POA has been revoked as of May 7, 2013, by Mr. Eller, whose ability to manage his personal business and financial affairs is in some doubt.[7]

---

[5] Poer testified that a former ESCO manager, Dave Nightlinger, permitted IEC to "roll over" or defer payment on certain ESCO parts without Poer's knowledge and contrary to ESCO company policy and practice. (Tr. 189–90). As explained by IEC's Parts Manager, Gene Barkley, in the early years of his career, the standard deferred payment plan with ESCO was 360 days. (Tr. 140–41). IEC was permitted to make payment to ESCO for parts purchased and kept in inventory over the course of a couple of years, but that practice shifted gradually over time to a shorter window for deferred payment. (Tr. 140–41).

[6] Mr. Eisele served as counsel for IEC at the bench trial, the undersigned judge presiding, and continues to do so.

[7] This information came to the Court by email, copy to defense counsel, from Mr. Eisele, on June 19, 2014. This email included other documentation concerning Mr. Eller's recent mental status, but his exact condition is not material to the decision herein, since presumably a legal guardian or other personal representative with authority could stand in for him in any event. Nevertheless, this issue serves to highlight the uncertainties inherent in Plaintiff's position that while title to the repurchased inventory is not good or certain − at present or at the time of trial − it could be made good at the time of transfer by legal action to be taken by Mr. Eller, a person not a party to this lawsuit, or by IEC.

19.     The parties stipulated that Mr. Eller was incapacitated and unable to testify. (Tr. 175–76). Mr. Eisele, in his role as designated POA in Mr. Eller's behalf, testified[8] that Mr. Eller had been receiving inpatient care at either a hospital or rehabilitation center since May 2, 2012, and that Mr. Eisele had since invoked the authority and assumed the responsibilities granted to him under the January 7, 1994 Power of Attorney. (Pl.'s Exh. 12) (Tr. 178).

20.     Dating back to October 31, 2002, IEC had a Line of Credit (up to three million dollars) with Piedmont Bank, a Division of Yadkin Valley Bank and Trust Company, to be used in the operation of IEC. In connection with the Line of Credit, IEC executed and delivered to Piedmont Bank a Promissory Note ("Note"). (Pl.'s Exh. 9 / Attachment 1). As security for the Note, IEC executed and delivered to Piedmont Bank a Security Agreement granting to Piedmont Bank a security interest in all of IEC's furniture, fixtures, inventory, equipment, and accounts receivable. (Pl.'s Exh. 9 / Attachment 2). Piedmont Bank recorded its security interest in the office of the Secretary of State for North Carolina by filing a UCC Financing Statement (No. 20090013488G). (Pl.'s Exh. 9 / Attachment 3). As a result, Piedmont Bank held a secured interest and first lien on IEC's assets. (Tr. 164–66).

21.     Mr. Eller was required to sign a Personal Guaranty on the IEC Line of Credit at the time the loan was originated. (Pl.'s Exh. 9 / Attachment 4; Tr. 172–73).

---

[8] The Court is mindful of the North Carolina Rules of Professional Conduct and the concerns related to an attorney of record providing testimony on his client's behalf. *See* N.C. REV. R. PROF. COND. § 3.7(a). In this particularly unique case, the Court determined that the prejudice to IEC should Mr. Eisele not be permitted to provide this fact testimony would be unduly prejudicial to IEC. The Court notes that Mr. Eller was deposed and subject to cross-examination by ESCO prior to his decline in health. Counsel for Defendant ESCO did not object to Plaintiff IEC's counsel testifying solely as a limited fact witness subject to cross-examination. (Tr. 176–77). It is also noted in passing that Mr. Eisele's daughter, Emily E. Lewis, serves all the judges of this district as a pro se law clerk, whose office is located in the Asheville Division of this Court. Ms. Lewis has taken no part in the proceedings involving the instant case.

22. Mr. Eller was also required to sign a personal guarantee on the renewal of IEC's line of credit on January 18, 2010. (Tr. 166−67). The 2010 guarantee was requested in the ordinary course of Piedmont Bank's business, which adhered to a policy requiring the bank to refresh and re-record UCC filings periodically (every ten years). (Tr. 172−73).

23. On August 18, 2010, ESCO notified IEC in writing that it was terminating the Agreement and the distribution relationship between ESCO and IEC, effective December 1, 2010 "with respect to IEC's North Carolina operations only."[9] (Pl.'s Exh. 2) (hereinafter "Notice").

24. After termination of the distribution relationship in North Carolina, ESCO continued to do business with IEC in South Carolina. IEC closed its South Carolina operations in April 2011.[10]

25. Initially, IEC contended that ESCO was without "good cause" to terminate the Agreement.[11] ESCO had to demonstrate good cause only as grounds to terminate the Agreement

---

[9] In questioning the validity of the Notice of Termination, IEC contends that Paragraph 16.6 of the Agreement expressly stated that it was not divisible. (Tr. 279). In context, the Agreement's provision about divisibility came in a clause concerning assignment, entitled "Binding Effect: Assignment." (Agreement, 16.6) ("This agreement is not divisible and cannot be directly or indirectly assigned or transferred, in whole or in part, by either party without the written consent of the other . . . ."). In any event, divisibility of the Agreement is not dispositive of the issues presented here. Furthermore, the Court finds that all of the IEC parts − no matter their location at any given time in the North Carolina or South Carolina division of IEC − were for return upon termination. To this extent, the attempt by ESCO to limit its Notice of Termination to IEC's North Carolina locations was unavailing and unenforceable. Therefore, it will be disregarded. (*See, infra,* "Section III, ¶ 8 n. 21").

[10] IEC itself began a liquidation process in June 2012.

[11] Litigation of the "good cause" termination question would have required the Court, as factfinder, to determine whether IEC was meeting its obligations under the terms of the Agreement. (Agreement, § 13.1). IEC had experienced financial difficulty during 2008 and 2010. Because this issue has been eliminated from the case, the Court has not endeavored to glean what the parties' understanding was regarding sales volume objectives and inventory levels. However, to the extent equitable factors had any probative value to the issue at hand, the Court notes that the Agreement, while not an exclusive agreement, states that "ESCO does not intend to appoint other dealers in the Territory unless, in ESCO's opinion, Dealer fails to adequately develop the market potential for particular Products or market segments in the Territory." (Agreement, § 1). The Court also recognizes that ESCO made a decision to

immediately and without providing IEC a notice or termination period.  (Agreement, § 13.1).

This aspect of the litigation has been rendered moot as adequate statutory notice of ESCO's

decision to terminate (partially) the Agreement was provided to IEC.  IEC's First Cause of

Action alleging wrongful termination in violation of North Carolina law was voluntarily

dismissed with prejudice on June 2012 pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii).

26.     The remaining dispute stems from IEC's decision making regarding its Inventory

of ESCO product − specifically, both  the makeup and extent of Inventory in existence upon

notification that ESCO would terminate the Agreement, and the degree to which ESCO is

obligated to repurchase Inventory from IEC under North Carolina law and the Agreement.

27.     ESCO's Notice provided IEC "ninety days to wind up its ESCO product business

in North Carolina" (a 90-day Termination Period).  (Notice, at 1.)   The Notice explained that

IEC's request to repurchase Inventory should be made in writing, should include a list of parts

for which repurchase is requested, and that an ESCO representative would inspect the Inventory

prior to acceptance for repurchase within sixty (60) days after receipt of IEC's request for

repurchase.

28.     With reference to ESCO product in IEC's possession, the Notice stated:

> In the event that any ESCO machinery, industrial equipment, outdoor power
> equipment, attachments or spare parts (collectively referred to as "Inventory"), or
> specialized repair tools, remain unsold as of December 1, 2010, ESCO will
> repurchase those items from IEC, subject to the following limitations: ESCO will
> pay . . . 75% of the current net price of all ***new, unused, and undamaged repair
> and superseded parts*** . . . .

> This offer to repurchase does <u>not</u> extend to:

---

open its own ESCO store / distributorship in North Carolina in 2010.

(1)     A repair part with a limited storage life or otherwise subject to deterioration; or

(2)     A single repair part that is priced as a set of two or more; or

(3)     A repair part that, because of its condition, is not resalable as a new part without repackaging or reconditioning; or

(4)     Any repair part that is not in new, unused and undamaged condition; or

(5)     Any item of Inventory for which IEC does not hold title free of all claims, liens and encumbrances (except for any security interest ESCO may hold); or

(6)     Any Inventory, repair parts or specialized tools that IEC orders after this notice of termination; or

(7)     Any Inventory purchased more than 36 months prior to this notice of termination; or

(8)     Any Inventory or specialized tools that IEC purchased from a source other than ESCO.

(Notice, at 1−2; see also § 66-184(b)) (emphases added).

29.     The majority (if not all) of IEC Inventory consisted of wear parts (or other parts) as opposed to machinery, equipment, or attachments.  (Tr. 23-24).  The term "wear parts" refers to a part on any type of equipment that actually comes into contact with the product / commodity or the ground such that it is subject to wear / being worn out and periodically in need of replacement.  (Tr. 8)

30.     After a certain amount of use, a "wear part" may be replaced with a "repair part." For purposes of this case, the term "wear part" is synonymous with "repair part" or "replacement part."

31.     Some of the parts in inventory were manufactured and purchased more than ten years ago and some of the parts are no longer in use within the industry.  (Tr. 32, 99).

32.     As of the hearing date, IEC had moved its remaining inventory to its Statesville location, including Inventory brought from IEC's South Carolina facility.  (Tr. 91).

33.    On December 23, 2010, ESCO sent IEC a letter offering to repurchase certain items of IEC's Inventory.  By this time, IEC's Inventory only consisted of ESCO wear, repair and replacement parts − no machinery, equipment, attachments, or specialized repair tools. When ESCO offered to repurchase certain items of the IEC Inventory in December 2010, ESCO was not aware of the lien held by Piedmont Bank.  (Tr. 224).

34.    In an email dated January 4, 2011 from ESCO District Manager Roger Long to Mr. Eller, with a copy to IEC Parts Manager Gene Barkley ("Barkley"), ESCO proposed a January 6, 2011 meeting to discuss the details of the dealer inventory return.[12]  (Def.'s Exh. 21). According to ESCO, a meeting was held on or around January 6, 2011 to discuss the return of inventory.  (Def.'s Exh. 23I, Tr. 124−26).  However, ESCO never participated in a physical inventory at IEC's Statesville facility with Barkley. (Tr. 92−93, 225−26).

35.    IEC has not returned any inventory to ESCO.  (Pl.'s Exh. 20).  The ESCO offer to repurchase was for a portion of IEC Inventory in the range of approximately $291,000 as opposed to authorizing the return and repurchase of all of the IEC Inventory which IEC valued at approximately $700,000.

36.    Piedmont Bank had an interest in IEC's Inventory through April 2012.

37.    On April 20, 2012, via execution of a document entitled, "Assignment of Interest in Promissory Note, Security Agreement, Financing Statement and Guaranty" ("Assignment"), Piedmont Bank assigned the IEC Note, Security Agreement, and UCC Financing Statement documenting its secured interest in the IEC assets to Mr. Eller *individually or personally*.  (Pl.'s Exh. 9, at 3 and Exh. 11; Tr. 170−71, 174).  The Assignment stated its purpose "to vest in Eller

---

[12] Barkley did not recall ever meeting with ESCO personnel and Mr. Eller on January 6, 2011, and was emphatic that no physical inventory of IEC Inventory was ever conducted in his presence.

such rights as Piedmont had under the Note, the Security Agreement, the Financing Statement and the Personal Guaranty . . . ."  (Pl.'s Exh. 9 at 4, ¶ 6).

38.     ESCO produced evidence of at least four other recorded security interests pending against IEC and IEC Inventory according to North Carolina Secretary of State's records.  (Def.'s Exh. 15).  All of these liens or security interests encumber inventory or equipment sold or leased to IEC by the respective secured parties, but ESCO is not one of those secured parties. These recorded security interests are not relevant here because they encumber property other than that produced by ESCO.[13]

39.     At the time ESCO notified IEC of its intention to terminate in part the dealer relationship, IEC had an outstanding balance with ESCO and IEC had in its inventory "ESCO parts with a current net price of approximately $363,130."  As of November 9, 2012, IEC held parts and superseded parts from ESCO valued by IEC at approximately $341,124.60.

40.     ESCO issued a credit to IEC in the amount of $35,374.18.

41.     IEC's practice was to store certain of its inventory of wear parts outside on the premises of its various locations.  (Tr. 11-12).  IEC primarily stored ground engaging tools outside.    Ground engaging tools are bucket teeth, cutting edges for a motor grader or front end loader, and certain manganese parts used in rock crushers. (Tr. 11).

42.     IEC's practice of storing these larger parts outside was customary for dealers within the industry.  (Tr. 255).

---

[13] Section 66-185 provides a list of exceptions from the general repurchase obligation of the Supplier, including "[a]ny inventory that was acquired by the dealer from a source other than the supplier."  N.C. Gen. Stat. § 66-185(7).

43.     Because the inventory of wear parts are stored outside unprotected from the elements, over the course of time, parts may have a discoloration or chipping of the paint, or may develop rust.

44.     Upon initial use, certain wear parts (e.g., ground engaging tools) sustain fairly significant external damage as the part is dug into the ground or rock.   (Tr. 94–95).

45.     In light of the intended purpose or function, the fact that paint may fade or chip, or the fact that rust has begun to develop, does not render a part unsaleable as new.  (Tr. 94). The parts IEC has in Inventory are not "unsaleable" or "unusable" solely because of a change in physical appearance.

46.     Prior to initial use, certain adapters must be welded and placed to a given machine.  In order to weld, the adapter must have a bright shiny metal surface which requires the paint to be removed (physically removed with a brush or a grinder) before use.  (Tr.  95, 104, 113–14).

47.     Mr. Eller was later asked to honor his Personal Guaranty and, in fact, eventually paid IEC's debt to Piedmont Bank in full and was released from further liability under the same. (Pl.'s Exh. 9, at 3, ¶ 4; Tr. 168–69).   At some point, Piedmont Bank deemed IEC in default on its loan although trial testimony was that the note "was not being handled as agreed."  (Tr. 173). Mr. Eller paid a total of $1,268,098.58 to Piedmont Bank in satisfaction of IEC's principal balance and accrued interest.  On March 19, 2012, Piedmont Bank was first paid the sum of $700,000.00 via check (Check No. 14819).  On March 29, 2012, Piedmont Bank received a wire transfer in the amount of $568,193.46 to be credited to IEC's balance.  (Pl.'s Exhs. 8A, 8B).  Mr. Eller paid the IEC liability off "predominantly with personal funds."  (Tr. 170).

48.     As previously noted, on April 20, 2012, upon satisfaction of IEC's debt, Piedmont Bank's secured interest in the IEC assets was assigned to Mr. Eller.  (Pl.'s Exhs. 9, 11).  The resulting security interest in IEC's inventory held by Frank Eller has not been released.

49.     Attorney Eisele represented to the Court that Mr. Eller was, and still is, willing to cancel any lien or encumbrance that he has personally against the IEC Inventory that IEC seeks to have ESCO buy back.  (Tr. 175).

50.     Shortly after Piedmont Bank's interest was assigned to Mr. Eller, at least by May 2012, Mr. Eisele advised ESCO's counsel of Mr. Eller's willingness to release his interest in the IEC inventory.[14]  (Def.'s Exh. 19)  On May 30, 2012, Plaintiff's counsel extended another invitation to ESCO suggesting a physical inspection of inventory on or after June 6, 2012. (Def.'s Exh. 19).

51.     Mr. Eisele deferred canceling any lien or encumbrance on the IEC Inventory before the Court was able to determine whether ESCO would be required to repurchase IEC assets.  (Tr. 180).

52.     Mr. Eisele conceded in his testimony that he could not assure ESCO or the Court that there was not another creditor that might *assert* a claim against IEC assets.[15]  (Tr. 182).

53.     ESCO's Dave Poer testified that none of the items shown in Plaintiff's Exhibits 18A through X appeared to be in a damaged condition or previously used.  (Tr. 231–32).

---

[14] Mr. Eisele's correspondence provided in pertinent part: "[I]t is clear that Frank Eller is the only person or entity with an enforceable lien against the ESCO inventory now owned by Interstate. Obviously, Frank would release that security interest in exchange for the purchase by ESCO of the inventoried ESCO parts, thus eliminating all claims, liens and encumbrances against those assets."

[15] A creditor asserting a claim does not mean that an asserted claim would be successful or that any enforceable interest exists.  No evidence was presented indicating the existence of any viable claim against the IEC inventory subject to repurchase by ESCO other than, possibly, the claim of Mr. Eller.

54.     Nonetheless, Poer testified that approximately ninety (90) percent of the parts IEC had in Inventory were not able to be resold as new parts without ESCO undertaking substantial refurbishing and reconditioning.

55.     Poer defined "new parts" as "something in a pristine condition as cast, manufactured by the manufacturer and distributed from the manufacturer itself."[16] (Tr. 232).

56.     The types of refurbishing ESCO might deem necessary before resale could include:  machining, blasting, sanding, dimensioning, magnaflux, and painting.  (Tr. 220).  In some cases, the refurbishing would need to be done to ensure fit and function of the part for its intended purpose.  (Tr. 233).

57.     Poer admitted during cross examination that IEC had stored parts like the ones on Exhibits 18A through X on the exterior of its Statesville location for forty (40) years or more, sold the same parts to its customer base as "new parts," and that ESCO had never entertained any complaint from an IEC customer concerned that it had not received a new part.  (Tr. 244).

58.     Poer conceded that he was not aware of the extent to which IEC could sell the same parts to consumers or end-users in the industry.  (Tr. 244).

59.     In the eight years prior, ESCO had never refused to accept any returned parts on the basis that they were damaged or needed reconditioning.  (Tr. 98).

60.     IEC was able to continue to make sales – without customer complaint – from its wear parts inventory to its ESCO parts customers following receipt of the August 18, 2010 Notice.  (Tr. 97).

---

[16] Poer's characterization of "new parts" seems to undermine the purpose of the repurchase obligation.

## II. The Parties' Legal Positions

IEC seeks relief pursuant to Sections 66-183, 184, and 185 of the Act which address the ESCO's duty to repurchase inventory held by the IEC.

IEC first contends that ESCO's repurchase obligation extends to any inventory IEC acquired prior to the August 18, 2010 Notice[17] regardless of whether ESCO product was purchased for resale at one of its North Carolina facilities or its facility in Columbia, South Carolina, and regardless of purchase date. With respect to the statutory exceptions based upon physical condition, IEC argues that the standard that should be met is the standard that the dealer has for sale of the parts in the marketplace. IEC recognizes that there is an existing encumbrance on the IEC inventory held by Mr. Eller. However, IEC argues that IEC can provide "title free of all claims, liens, and encumbrances" contemporaneously with the repurchase required by ESCO.

Alternatively, IEC argues that, because ESCO failed to send anyone to physically inspect IEC inventory within the allotted time period, ESCO is barred from challenging the statutory repurchase obligation and exceptions. See N.C. Gen. Stat. § 66-184(a) ("The supplier shall repurchase . . . .") and § 66-188(a)("If a supplier fails or refuses to repurchase any inventory covered under the provisions of this Article within the time periods established in G.S. 66-184, the supplier is civilly liable for one hundred percent (100%) of the current net price of the inventory . . . .").

ESCO contends that its repurchase obligation is nullified on multiple statutory grounds, including the exception to repurchase for encumbered property.[18] ESCO contends that because

---

[17] IEC does not request that ESCO repurchase parts IEC has since sold to customers' post-Notice of Termination on August 18, 2010.

[18] If applicable, § 66-185(4) is determinative of the repurchase question and renders all of the other statutory exception arguments <u>moot</u>.

IEC could not transfer clear title to its inventory of ESCO parts, ESCO is relieved of any obligation to repurchase any of IEC's Inventory by virtue of Section 66-185(4) as a matter of law. ESCO advocates for a ruling holding that before a supplier could be required to repurchase inventory from a dealer pursuant to § 66-185(4), the dealer must provide a release of lien and a document from its officers stating that there are no other claims, liens, or encumbrances, known or unknown, against the property. (Tr. 185).

Alternatively, to the extent the Court might find that ESCO's repurchase obligation remains under the Act, ESCO contends (1) the ninety day repurchase period has expired and, therefore, that ESCO is excused from any repurchase obligation the Act or the Agreement required. *See* N.C. GEN. STAT. § 66-184(a); (2) that repurchase is not required for Inventory items purchased more than thirty-six months prior to the Notice. N.C. GEN. STAT. § 66-186(6b); (3) that repurchase is not required for parts that are not resalable as new parts without reconditioning. N.C. GEN. STAT. § 66-184; (4) that repurchase is not required for Inventory as to which ESCO no longer has a "current net price" on the books; and (5) that repurchase is also not required for any of the Inventory that was moved from IEC's South Carolina facility to North Carolina.

### III.    Conclusions of Law

1.      Under North Carolina law, IEC is a "Dealer," which "means a person engaged in the business of selling retail farm, construction, utility or industrial, equipment, implements, machinery, attachments, outdoor power equipment, or repair parts." N.C. GEN. STAT. § 66-180(4).

2.      Under North Carolina law, ESCO is a "Supplier," which "means a wholesaler, manufacturer, distributor, or any purchaser of assets or stock of any surviving corporation resulting from a merger or liquidation, any receiver or assignee, or any trustee of the original manufacturer, wholesaler, or distributor who enters into an agreement with a dealer." N.C. GEN. STAT. § 66-180(9).

3.      The Agreement's requirement that IEC "[m]aintain adequate replacement parts inventories and service capabilities as required to provide such services" and "maintain a sufficient inventory to service the market" triggers application of the Act,  N.C. GEN. STAT. § 66-180, *et seq*.  (Agreement, § 2.2, ¶ 4 / Suppl. A)

4.      The Court applies North Carolina law in construing and applying the North Carolina Farm Machinery Act as well as the parties' Agreement.[19]

5.      The Agreement, which is only partly consistent with the Act, supplements the parties' respective statutory obligations.  To the extent there is conflict between the two, the Act governs as its provisions cannot be waived.[20]

6.      The Agreement contains a severability clause (Agreement, ¶ 16.3) such that upon the Court's determination that portions of the Agreement are unenforceable because of inconsistency with terms of the Act, the consistent terms of the Agreement nevertheless remain in effect.  Consequently, the Act, supplemented by consistent terms of the Agreement, constitutes the overall contract ("Contract") of the parties.

---

[19] Although Paragraph 16.5 of the Agreement states that it is to "be construed in accordance with the laws of the State of Oregon," the parties agree that North Carolina law applies to the issues presented.

[20] The Act provides that "[t]he provisions of [§] 66-182 through [§] 66-187.1 shall not be waivable in any contract or agreement, and any such attempted waiver shall be null and void."  N.C. GEN. STAT. § 66-188(b1).

7.      "Inventory" means farm implements and machinery, construction, utility and industrial equipment, consumer products, outdoor power equipment, attachments, or repair parts. N.C. Gen. Stat. § 66-180(7).

8.      ESCO's August 18, 2010 Notice of Termination ("Notice"), effective December 1, 2010, provided IEC ninety days' notice, which is sufficient notice under the Agreement and the Act.  The Notice is construed in the same manner as the Agreement, under which it was issued, in the sense that it is effective only insofar as it is consistent with the Act, which takes precedence in its provisions concerning notice of termination of an agreement.[21]

9.      Section 66-183 addresses the Supplier's [ESCO's] duty to repurchase inventory held by the Dealer [IEC]:

> (a) Whenever a dealer enters into an agreement evidenced by a written or oral contract in which the dealer agrees to maintain an inventory, and the agreement is terminated by either party, the supplier shall repurchase the dealer's inventory as provided in this Article unless the dealer chooses to keep the inventory. If the dealer has any outstanding debts to the supplier, then the repurchase amount may be set off or credited to the retailer's account.
>
> N.C. Gen. Stat. § 66-183.

10.     The Act requires repurchase of Inventory within 90 days from termination.  N.C. Gen. Stat. §§ 66-183, 184.  It appears the Act contemplates a 90-day termination period which would run from delivery of notice to the effective date of termination, in this case to approximately December 1, 2010.   The Agreement contemplates that the repurchase of parts (as

---

[21]  For example, ESCO's attempt to limit the termination to IEC's North Carolina operations only is ineffectual, as the Act does not contemplate partial termination.  Moreover, as specified in its Paragraph 16.6, the Agreement was indivisible.  The Notice also purports to state specific terms for repurchase of inventory but they differ from the requirements of the Act, such as pricing at only 75 % rather than the 90 % stipulated by the Act, and so such terms are unenforceable. On the other hand, the Notice suffices to put the Dealer on notice of Supplier's intention to terminate the Agreement and of the effective date of termination.

opposed to all Inventory) is to occur during the approximately 90-day termination period [August 18, 2010 through December 1, 2010] subject to ESCO's Parts Return Policy. (Agreement, ¶ 12.4).

11.     The Act calls for inspection of returnable parts within sixty days of the effective date of termination.  N.C. GEN. STAT. § 66-186(c).  The Act requires representatives for both the Dealer and Supplier to participate in inspection and states that if the Supplier fails to provide a representative within those sixty days, automatic acceptance of all returned items is assumed.  Id.

12.     Section 66-184 of the Act provides in pertinent part:

(b) The supplier shall pay the dealer:

(2) Ninety percent (90%) of the current net price of all new, unused, and undamaged repair and superseded parts.

(d) The supplier shall pay the cost of shipping the inventory from the dealer's location and shall pay the dealer ten percent (10%) of the current net price of all new, unused, undamaged repair parts returned, to cover the cost of handling, packing, and loading. The supplier may perform the handling, packing, and loading instead of paying the ten percent (10%) for the services. The dealer and the supplier may each furnish a representative to inspect all parts and certify their acceptability when packed for shipment.

N.C. GEN. STAT. §§ 66-184(b)(2) and (d).

13.     The term "current net price" means the price listed in ESCO's supplier's list or catalog in effect on December 1, 2010 (the effective date of termination), less any discounts that were allowed on IEC's original purchase.  § 66-180(3).

14.     "Superseded part" means any part that will provide the same function as a currently available part as of the date of cancellation.   N.C. GEN. STAT. § 66-180(10).

15.     The following clause within the Agreement is inconsistent with the Act: "Returnable parts shall be limited to parts then currently stocked by ESCO."  (Agreement ¶

12.4).  There's nothing in the Act to limit repurchase to currently stocked parts.  With respect to "current models," Section 66-185 was amended in 2001 to add "used *equipment* and *equipment* that is not a current model" to the list of exceptions.[22]  <u>There is no comparable provision excluding repair *parts* that are not current models.</u>

16.     To the extent the Agreement contains lower percentages for the price of repurchase, the statutory requirements govern.

17.     ESCO's Parts Return Policy, namely, the provision that permits the dealer to return only "qualified" parts, does not affect the instant analysis where inconsistent with the statute.  (Def.'s Exh. 11).

**A.  IEC's Encumbered Inventory Does Not Excuse ESCO's Repurchase Obligation**

1.     North Carolina does not require repurchase from a dealer of:

(4) An item of inventory for which the dealer does not have title free of ***all claims, liens, and encumbrances*** other than those of the supplier.

N.C. GEN. STAT. § 66-185(4) (emphasis added).

2.     The Act does not define the phrase "title free of all claims, liens, and encumbrances" or otherwise identify the various types of legally enforceable liens that could conceivably exist.

3.     The Act does not specify the time as of which the "title free of all claims, liens, and encumbrances" condition must be met.

4.     As far as construction and application of the Act, there is little guidance from the North Carolina courts.  The only published case discussing the Act held that the statute did not

---

[22] "Current model" means a model listed in the wholesaler's manufacturer's, or distributor's current sales manual or any supplements.  N.C. GEN. STAT. § 66-180(2).

apply retroactively to the franchise agreement there in dispute.  *See e.g., Wilson Ford Tractor, Inc. v. Massey-Ferguson, Inc.*, 414 S.E.2d 43, 572–74 (N.C. App. 1992) (summarizing the supplier's repurchase requirement; holding the Act inapplicable to a franchise agreement entered into prior to effective date of the Act).   In the instant case, the Act became effective before the Agreement did and the Act therefore applies.

5.      Legislative intent is controlling in statutory construction.  *State ex rel. Utilities Comm'n v. The Public Staff – North Carolina Utilities Comm'n*, 306 S.E.2d 435, 443−44 (N.C. 1983) (citing *In re Brownlee*, 272 S.E.2d 861 (N.C. 1981); *State v. Fulcher*, 243 S.E.2d 338 (N.C. 1978); *Housing Authority v. Farabee*, 200 S.E.2d 12 (N.C. 1973)).

6.      "In ascertaining the legislative intent, courts should consider the language of the statute, the spirit of the statute, and what it seeks to accomplish."  *State ex rel. Utilities Comm'n*, 306 S.E.2d at 443−44 (citing *Stevenson v. City of Durham*, 188 S.E.2d 281 (N.C. 1972)).

7.      A review of the statutory scheme as a whole reveals a legislative attempt to provide protection for the dealer in certain respects (without providing the dealer a windfall). *See e.g., Town and Country Equipment, Inc. v. Massey-Ferguson, Inc.*, 808 F.Supp. 779, 781 (discussing similar Kansas statutory scheme).  This objective is evident in the Act's provision for repurchase by the supplier in the event that the dealer dies or becomes incompetent, N.C. GEN. STAT. § 66-183(b), in its section prohibiting various coercive acts by the supplier or termination based on circumstances beyond the dealer's control, N.C. GEN. STAT. § 66-187.1, and in its creation of a civil remedy for the dealer where the supplier fails or refuses to repurchase inventory, N.C. GEN. STAT. § 66-188.

8.     The Court assigns these terms their ordinary, everyday meaning.  The word "all" thus is taken to mean all-inclusive or without exception.[23]  Use of the word "all" reflects the legislature's intent to encompass every possible claim, lien, and encumbrance.

9.     The terms "claim," "lien," and "encumbrance" each refer to some type of impediment to free or good title such as an existing security interest.[24]

10.     Under the Act, ESCO is entitled to demand assurances concerning "title free of all claims, liens, and encumbrances."

11.     The sole encumbrance identified in the evidence is one held by Mr. Eller, the president and sole shareholder of IEC stock.  Mr. Eller is not subject to the Court's authority, as he is not a party to this litigation.  Nonetheless, Mr. Eller's attorney, Mr. Eisele, has maintained that the security interest Mr. Eller holds will be cancelled of record and otherwise extinguished at closing.  Otherwise, the transaction would not close and ESCO's statutory obligation to repurchase will be eliminated.

12.     While the statute does not expressly address timing for satisfaction of the free and clear title condition, it would be nonsensical to interpret the statute in such a way as to hold that only repurchase property free and clear as of the time of filing the dealer's complaint, or some other arbitrary date, could be considered eligible for repurchase.  The proper focus for the timing issue, as with sales transactions generally, is to require that the dealer's inventory be free and

---

[23] Merriam Webster Online Dictionary provides the following definition of the adjective "all": "the whole, entire, total amount, quantity, or extent of; every member or part of; the whole number or sum of."  http://www.merriam-webster.com/dictionary/all (October 25, 2013).

[24] The term "lien" refers to "[a] legal right or interest that a creditor has in another's property, lasting usually until a debt or duty that it secures is satisfied."  BLACK'S LAW DICTIONARY 933 (7th ed. 1999).  An "encumbrance" is defined as "[a] claim or liability that is attached to property or some other right and that may lessen its value, such as a lien or mortgage; any property right that is not an ownership interest."  *Id.*, 547.

clear as of the time of closing of the repurchase transaction. In this case, that means the time of delivery of repurchased inventory of ESCO. N.C. Gen. Stat. § 66-184(f).

13. Under the Court's interpretation of § 66-185(4), and given the consistent representations of counsel for IEC (and Mr. Eller personally), the current existence of the security interest held by Mr. Eller is not determinative of ESCO's repurchase obligation.

14. Accordingly, ESCO is obligated to repurchase IEC inventory subject to IEC's showing that Mr. Eller's security interest will be extinguished at closing. Mr. Eisele heretofore had maintained that Mr. Eller provided a POA sufficient to allow Mr. Eisele himself, as designated holder of the POA, to nullify Mr. Eller's security interest on Mr. Eller's behalf at closing. That POA is no longer in effect. Thus, it will remain the duty of IEC to obtain and apply a legally binding release of all interest owned by Mr. Eller in the repurchased property at closing, along with further assurance by IEC, satisfactory to the Court, that such property is then properly represented as having "title free of all liens, claims, and encumbrances."

**B. The Statutory Time Periods Related to the Supplier's Repurchase Obligation Were Tolled or Waived**

1. Under N.C. Gen. Stat. § 66-184(a), the supplier ESCO "shall repurchase from the dealer within 90 days after termination of the agreement all inventory previously purchased from the supplier that remains unsold on the date of termination of the agreement."[25]

2. Moreover, "[i]f a supplier fails or refuses to repurchase any inventory covered under the provisions of this Article within the time periods established in G.S. 66-184, the supplier is civilly liable for one hundred percent (100%) of the current net price of the inventory .

---

[25] Since the Agreement effectively terminated December 1, 2010, ninety days after termination was on or around March 1, 2011.

. . ."

3.      The Court does not find the statutory time periods determinative in light of the nature and development of the parties' legal dispute during the relevant time period following termination.

4.      IEC continued to sell ESCO parts in the marketplace after December 1, 2010 at all three IEC locations because IEC did not believe ESCO had "good cause" to terminate the Agreement.

5.      Likewise, IEC did not respond upon receipt of ESCO's RMAs (Return Materials Authorization) because IEC originally contended that IEC should remain an ESCO dealer.

6.      Because the Notice of Termination letter proposed to pay less (75 %) for parts available for repurchase than the statutorily required percentage (90 %), IEC had no legal obligation to return parts to ESCO on such terms.[26]  ESCO's September 2012 sworn response to Interrogatory No. 6 concedes this point.   (Pl.'s Exh. 13, ¶ 6).

7.      Section 66-186 reads in part:

> The dealer and supplier shall furnish representatives to inspect all parts and certify their acceptability when packed for shipment. Failure of the supplier to provide a representative within 60 days shall result in automatic acceptance by the supplier of all returned items.

N.C. Gen. Stat. § 66-186(c)(2005).

8.      A meeting to discuss IEC's inventory return was held on or around January 6, 2011 on the IEC grounds.  ESCO District Manager Roger Long was in attendance.

_____

[26]  The Notice stated that ESCO would pay IEC "75% of the current net price of all new, unused, and undamaged repair and superseded parts."

9.      It is undisputed that ESCO never conducted an inspection or physical inventory of the returnable items within the statutory sixty day period.

10.      ESCO contends that it did not send a representative to IEC to discuss the return of parts, or to inspect IEC Inventory, because of the instant lawsuit.  (Pl.'s Exh. 13, ¶ 6).

11.      In light of the litigation that ensued, the Court does not find the sixty day period for inspection by ESCO controlling.

12.      ESCO admitted in discovery that neither of the statutory time periods for demanding repurchase by IEC or the inspection of IEC inventory subject to repurchase by ESCO were controlling as long as the litigation was in process.[27]  (Pl.'s Exh. 13, ¶ 6).

13.      Neither party acted with conscientious regard for the statutory time lines for repurchase and inspection.  Litigation intervened in that IEC sought initially to preserve the supplier-dealer relationship and only later reduced its claim to one for repurchase of inventory.  ESCO's Notice was imperfect for noncompliance with the Act's requirements.  The parties made some efforts to get together for an inspection, even during the litigation, but it was inconclusive and no physical inventory, much less inspection, ever took place.  Neither party, therefore, is positioned to benefit from a shortcoming by the other in respect to time lines.

14.      The respective statutory limitations on time to accomplish repurchase-related

---

[27]  ESCO's Answer to Interrogatory No. 6 reads:

"[S]o long as the instant litigation is in process, any delay by IEC in demanding a repurchase, and any delay by ESCO in effecting a repurchase does not adversely impact either party's rights and duties under the statute.  Until the parties' rights and duties regarding repurchase pursuant to the statute have been determined by the Court, ESCO has no obligation to inspect and repurchase and IEC has no obligation to tender inventory for repurchase."

tasks for both parties were tolled and / or waived during the pendency of litigation. The Court will at this juncture order a set of dates to be respected by both parties in winding up the repurchase required by the Act.

### C.  Repair Parts Purchased More Than 36 Months Prior to Termination Are Subject to the Supplier's Repurchase Obligation

1.      Under the Act, the supplier is not required to buy back certain kinds of inventory purchased more than thirty-six months prior to the Notice of Termination.  *See* N.C. GEN. STAT. § 66-186(6b).

2.      Section 66-186(6b) applies to Inventory items including: "farm implements and machinery, construction, utility and industrial equipment, outdoor equipment, and attachments." N.C. GEN. STAT. § 66-186(6b).

3.      Contrasting § 66-186(6b) with the statutory definition for "Inventory," the Court observes that the only category of Inventory not expressly identified within § 66-186(6b) is "repair parts."

4.      Throughout the Act, "repair parts" are distinguished from other types of inventory and treated in a different manner for purposes of repurchase.

5.      The Court finds that this omission is indicative of a legislative intent to exclude "repair parts" from the § 66-186(6b) exception to the supplier's repurchase obligation.

6.      The Court finds as a matter of law that this provision does not pertain to repair parts.

7.      The Agreement's limitation on repurchase to all inventory purchased more than

thirty-six months prior to the Notice of Termination is inconsistent with the statute and unenforceable.

8.      Because the only component of "Inventory" IEC is submitting for repurchase is ESCO repair parts, Section 66-186(6b) does not apply here to exempt older repair parts of any duration from ESCO's repurchase obligation.

### D.  There Is No Evidence of the Dealer's Election to Keep Inventory

1.      The Act does not require the Seller to repurchase "[a]ny inventory that the dealer chooses to keep."  N.C. Gen. Stat. § 66-185(5).

2.      ESCO's December 2010 correspondence with the subject matter identified as "RE: Final Return Authorization" expressly notes the fact that IEC made a formal request for repurchase.   (Pl.'s Exh. 20).

3.      There was no evidence presented that tends to show that IEC intended to keep any or all of its inventory of  ESCO wear parts other than the fact that IEC's South Carolina operation continued its business into 2011.

### E.  ESCO's Legal Position Concerning Applicability of Exceptions to Repurchase Due to Condition Would Undermine the Purpose of the Act

1.      Neither the Act nor the Agreement requires Defendant ESCO to repurchase all of the IEC Inventory without exception.  For example, the following statutory criteria is also found within the Agreement:

> A repair part that, ***because of its condition, is not resalable*** as a new part without repackaging or reconditioning; or
>
> Any repair part that is not in new, unused and undamaged condition;

(§§ 66-185(3) and (3a); Notice, at 1-2, ¶¶ 3, 4) (emphasis added).

2.      In this "wear part" context, the Court construes "undamaged condition" to reference a part's use and functionality rather than superficial damage in appearance.[28]

3.      Over the course of the parties' business relationship, it has been the custom and practice of ESCO to accept returned repair parts from IEC applying discounts for condition where appropriate.

4.      Credible testimony from Barkley established that ALL of the repair parts in IEC's inventory were in "new, unused, and undamaged condition." (Tr. 111).

5.      Plaintiff has proved that the predominance of the repair parts for repurchase are resaleable as new without repackaging or reconditioning. (*See* "Section I, ¶¶ 13, 41−46, 57−60" above).

6.      To adopt ESCO's position negating repurchase would undermine the letter and spirit of the Act.

7.      Under the parties' Agreement,

> All refurbishing costs will be for Dealer's account and final account adjustment shall not be made until such costs are known.

(Agreement, ¶ 12.4). This clause survives because it is not inconsistent with the Act.

8.      Given the nature of the wear parts' intended use, and in light of the parties' prior course of conduct, the Court finds that ESCO will be required to repurchase repair parts that are new, unused and undamaged, as viewed in the context of this Order. In other words, if the repair part has never been used and has only superficial discoloration, paint chipping, and the like,

---

[28] Ordinarily, the term "damaged goods" means products that are "broken, cracked, scratched, etc." http://www.merriam-webster.com/dictionary/damaged goods (April 14, 2014). As previously noted, ESCO's representative testified that none of the items shown in Plaintiffs' Exhibits 18A through X appeared to be in such a damaged condition.

repurchase will be required subject to any discounting in price for the costs of reconditioning incurred by ESCO.[29]

### F.  Current Net Price

1.      Mr. Poer testified that with respect to particular ESCO parts – parts that had since been replaced or superseded – ESCO did not have any "current net price."  (Tr. 237).

2.      In the event no "current net price" is on record for a given part, IEC contends that the custom and practice of the parties has been for ESCO to pay IEC for returned parts the price IEC last paid for the part.[30]  (Tr. 117−18, 281) (*See* "Section I, ¶ 13, n. 4").

3.      To excuse ESCO's statutory repurchase obligation due to its contention that it has no "current net price," would undermine the purpose of the Act.

4.      Absent the parties' agreement as to a different method for arriving at a substituted "current net price", the Court finds that ESCO's repurchase price should be calculated by subtracting any necessary expense ESCO will incur under § 66-184(b)(2) from the "current net price" in existence on December 1, 2010.  (*See* "Section III, ¶ 13," above).

## IV.    Order

**IT IS THEREFORE ORDERED THAT:**

1)      Subject to these Factual Findings and Conclusions of Law, ESCO's obligation to repurchase ESCO product from IEC pursuant to the North Carolina Farm Machinery Franchise Act, N.C. GEN. STAT. § 66-180, *et seq* remains.

---

[29]  This Court does not intend to offer any opinion as to the use and functionality of the various categories of repair parts in hopes that, given the guidance herein, the parties can rely upon their expertise and knowledge of industry standards to reach a final resolution on repurchase as to price, refurbishing, if any, and shipping.  Shipping is governed by § 66-184.  (*See* "Section III, ¶ 12," above).

[30]  The Court is aware that IEC's Exhibit 16 was prepared by Plaintiff using only IEC figures and that IEC's computer program reflects the purchase price as an average price per part when multiple items are in inventory.  (Tr. 145, 154−55).  In addition, IEC utilized a First In First Out ("FIFO") method of accounting.  (Tr. 155).

2)       ESCO's statutory repurchase obligation of IEC Inventory is conditioned upon the release (or extinguishing) of Mr. Eller's security interest, and contemporaneous showing by IEC that good title exists at the time of  transfer / repurchase.  Within seven days of filing of this Order and Findings of Fact and Conclusions of Law, IEC shall file with the Court its plan for extinguishing any security interest held by Mr. Eller, and an affidavit by IEC attesting to further assurance of good title for ESCO in repurchase parts.  If deemed sufficient by the Court, the Court will issue a time table for concluding the repurchase.  (*See* "Section III, A, ¶ 14" and "Section I, n. 18.").

3)       The parties will be required to compile a final accounting for approval by the Court, taking into account the following:  (i) at the time ESCO notified IEC of its intention to terminate the dealer relationship, IEC had an outstanding balance with ESCO; (ii) by September 2012, ESCO indicated that "[a]ll obligations other than any statutory obligation to repurchase ha[d] been resolved between the parties."  (Pl.'s Exh. 13, ¶ 8) (IEC no longer had any outstanding debt to ESCO); (iii) as of November 9, 2012, IEC held parts and superseded parts from ESCO valued by IEC at approximately $341,124.60[31]; (iv) ESCO issued a credit to IEC in the amount of $35,374.18; (v) as part of repurchase, IEC's account is to be adjusted further for the costs incurred by ESCO for refurbishing the parts; and (vi) under § 66-183, "[i]f the dealer has any outstanding debts to the supplier, then the repurchase amount may be set off or credited to the retailer's [dealer's] account."

4)       Because ESCO's Counterclaim against IEC sought a declaration of the parties' rights under the Agreement and the Act, all of the factual and legal issues raised by way of

---

[31] This is a different figure than as of December 2010 because IEC continued to make sales after termination of the Agreement.

ESCO's Counterclaim have been addressed within these Findings of Fact & Conclusions of Law.[32] The Counterclaim is therefore dismissed as <u>moot</u>.

     5)     This matter shall remain open pending further orders of the Court.

Signed: July 17, 2014

Richard L. Voorhees
United States District Judge

---

[32] In its Counterclaim, ESCO sought a declaratory judgment stating that ESCO was in compliance with the Agreement and the Act. In addition to seeking clarification concerning its statutory repurchase obligation, if any, ESCO's Counterclaim, as amended, specifically alleged 1) that ESCO's termination of the Agreement fully complied with the Act; 2) that ESCO issued a credit to IEC in the amount of $35, 374.18, and issued a Return Material Authorization ("RMA") to IEC (which pertains to repurchase); and 3) that "IEC has not taken any action on the RMA and that repurchase remains open pending receipt of materials from IEC." (Doc. 33 / Am. Answer & Counterclaim, ¶ 12). This Court has identified those areas where the Act effectively superseded the terms of the parties' Agreement, rendering various provisions in the Agreement invalid and unenforceable. In addition, the parties' outstanding obligations under the Act and Agreement are outlined herein.